UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80008-Civ-Hurley/Hopkins

RANDOLPH STARLING,

      Plaintiff,

vs.

BOARD OF COUNTY
COMMISSIONERS, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION AS TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DEs 50, 68) AND THE PARTIES' MOTIONS TO STRIKE (DEs 92, 99, 108, 135, 143)

THIS CAUSE comes before the Court upon an Order referring Defendants' Motions for Summary Judgment to the undersigned Magistrate Judge for a report and recommendation. (DE 73).

Presently before the Court are Defendants' Motions for Summary Judgment filed on September 12, 2008. (DE 50, 68). Plaintiff filed opposition papers on October 15, 2008 and October 21, 2008 (DEs 80, 83, 84), and Defendants filed reply papers shortly thereafter. Also before the Court are numerous Motions to Strike filed by the parties. (DE 92, 99, 108, 135, 143). These matters are now ripe for this Court's review.

## I.   BACKGROUND

Plaintiff initiated this action pursuant to 42 U.S.C. § 1983, alleging that Defendants have violated his due process rights under the Fourteenth Amendment, as well as his right to freedom

of association under the First Amendment.  (DE 1).  According to the Complaint, Plaintiff has worked as a firefighter for the Defendant County since 1994 under the supervision of Defendant Fisher, the District Chief.  (DE 1).  Plaintiff states that through the course of several promotions, he rose to the rank of Captain in 2002.  Notably, for the first twelve years of Plaintiff's employment, he had an "exemplary record" and "very good yearly evaluations."  *See* Declaration of Randolph Starling at ¶ 3.

However, according to Plaintiff, difficulties arose with Defendant Fisher in 2005 when Plaintiff began dating a subordinate, Carolyn Smith, who is now Plaintiff's wife.  Specifically, Plaintiff claims that at the time, Defendant Fisher (who was married) was romantically involved with a co-worker (who was also married) and that the two would often use Ms. Smith's home "for romantic encounters."  (DE 1 at ¶ 9).  In October of 2005, Plaintiff moved into Ms. Smith's home.[1]  Shortly thereafter, Ms. Smith told Defendant Fisher and his girlfriend that they could no longer use her home as a meeting place.  According to Plaintiff, "[t]his action greatly upset Defendant Fisher, who began to misuse his supervisory position over Plaintiff and Ms. Smith to punish them for interfering with his use of Ms. Smith's home."  (DE 1 at ¶ 9).

Plaintiff alleges that Defendant Fisher began to follow Ms. Smith when she went on rescue calls in an attempt to catch her doing something wrong.  *See* Deposition of Carolyn Smith at page 68.  Plaintiff also alleges that Fisher threatened to terminate and/or demote him due to his association with Ms. Smith.  (DE 1 at ¶ 10).  Plaintiff told his union representative about Fisher's

---

[1]  Plaintiff was still married to his prior wife when he began his relationship with Ms. Smith. (DE 50 at ¶ 7).  However, Plaintiff and his wife were legally separated and divorce proceedings were well underway when Plaintiff and Ms. Smith began living together in October 2005.  (DE 80 at page 30).   Plaintiff's divorce became final on April 12, 2006 and Plaintiff and Ms. Smith were subsequently married in June 2006.  *See* Starling Declaration at ¶ 4.

2

threats, but this only further angered Fisher.  *Id.*  According to Plaintiff, in January 2006, Fisher

retaliated against him by "resurfac[ing] an incident" that had occurred in the summer of 2004.

(DE 1 at ¶ 11).  According to Plaintiff, the incident involved an elderly woman who fell from her

bicycle directly in front of a parked truck that Plaintiff was sitting in, but "[b]ecause there was no

impact, no injuries and because the woman declined to be seen by paramedics" Plaintiff, with

Fisher's "explicit approval," did not file an accident report.  *Id.*  Instead, Plaintiff noted the

incident in the Captain's log book.[2]  Nevertheless, Plaintiff contends that eighteen months later,

Fisher relied on the incident to falsely charge Plaintiff with failure to report an accident in a

County owned vehicle.  (DE 1 at ¶ 12).[3]

Fisher denies any personal knowledge of the bicycle incident, making any report or

complaint about it, or having any involvement in the subsequent investigation.  *See* Affidavit of

---

[2] According to Plaintiff, that log book has "since disappeared" from Defendants' possession.
(DE 1 at ¶ 11).

[3] There are conflicting versions of the bicycle incident.  In addition to Plaintiff's version, the
elderly woman, Beatrice Smith, testified at her deposition that she "bumped into" Plaintiff's truck.
*See* Deposition Transcript of Beatrice Smith at page 10.  She testified that she did not fall and was
not injured, but that her bicycle was damaged.  *Id.* at pages 10, 14.  There is also testimony from
another firefighter, Ernest Hill, who claims that he encountered Beatrice Smith later that day and she
told him that Plaintiff "knocked her off her bike" as he was driving his truck.  *See* Deposition of
Ernest Hill at pages 15-16.  She told Hill she had no injuries but the front wheel of her bicycle was
bent.  *Id.*

Ken Fisher at ¶ 14, 15 (DE 51).[4]  Fisher denies threatening Plaintiff with a demotion.  *Id.* at ¶16.[5]

According to Fisher, his "primary concern" was that Plaintiff's job performance began to suffer

because of his relationship with Ms. Smith.  *Id.* at ¶13.  Fisher states he was also concerned that

Ms. Smith might initiate a sexual harassment suit against Plaintiff and the department.  *Id.*  On

January 11, 2006, Fisher issued an Employee Development Form (EDF) to Plaintiff regarding his

"preoccupation with Ms. Smith" in an effort to "correct the situation before it led to discipline."

*Id.* at ¶ 10, 11.  *See also* Fisher's Aff., Exhibit F2.  Upon receiving the EDF, Plaintiff responded

in writing that Fisher had created "a hostile work environment" for himself and Ms. Smith.  *See*

Plaintiff's Exhibit 1-A.  Five days later, Al Sierra, the Operations Division Chief, sent an internal

memorandum to Staff Captain Iden Miller, asking him to commence an investigation into the

2004 bicycle incident.  The memo stated in part, "[t]oday I was apprised of an alleged situation

that occurred involving Randolph Starling.  It was conveyed to me that recently Captain Starling

was involved in an accident involving a county vehicle and a pedestrian."  *See* Defendants'

Exhibit 11.

    One month later on February 13, 2006, Fire Rescue Administrator Herman A. Brice

imposed a double demotion on Plaintiff to the position of paramedic/firefighter.  *See* Defendants'

Exhibit 21.  Defendants contend that Plaintiff was demoted "because of three incidents of

---

    [4] Fisher's denial is undermined by the deposition testimony of Carolyn Smith.  She testified that the co-worker with whom Fisher was having an affair told her that Fisher had made the complaint about the bicycle incident.  *See* Deposition of Carolyn Starling at page 14.  In addition, Firefighter Ernest Hill testified that Fisher approached him about the bicycle incident and told him that it had not been documented.  *See* Deposition Transcript of Ernest Hill at page 27.

    [5] Fisher's denial is directly refuted by Plaintiff and Ms. Smith, both of whom state that Fisher threatened Plaintiff with a demotion.  *See* Declaration of Randolph Starling at ¶ 6; Declaration of Carolyn Smith at ¶ 7.

4

violating Fire Rescue rules and regulations," namely, (1) the bicycle incident; (2) a December 19, 2005 incident where Plaintiff "failed to follow department protocol by discontinuing patient care prior to arrival at a hospital;"[6] and (3) a January 6, 2006 incident where Plaintiff "had a two hour delay in returning to his zone."[7]   (DE 50 at ¶ 1, 11-13).

Plaintiff contends that Fisher's false allegation against him regarding the bicycle incident was the primary basis for his demotion.  According to Plaintiff, his "unprecedented" double demotion to the position of firefighter/paramedic caused him to sustain a $20,000 per year loss in salary.  (DE 1 at ¶ 13).  Plaintiff also alleges that the Defendant County has "placed false and stigmatizing documents" in his personnel file, without providing him with the opportunity for a hearing to clear his name and reputation.  (DE 1 at ¶ 16).

Defendants respond that there is "undisputed evidence" that (1) Plaintiff and the union received written notice of these investigations as well as the charges against Plaintiff; (2) they received an explanation of Fire Rescue's evidence against Plaintiff during both the disciplinary

---

[6]  Plaintiff disputes that he engaged in any misconduct in the "discontinuing patient care" incident.  Rather, Plaintiff states that he "clearly followed protocol for not initiating resuscitation efforts of an infant who had been unviable for several hours and where there was a danger that [Plaintiff's] employees could disturb what ultimately was declared a crime scene."  (DE 80).  *See also* Declaration of Randolph Starling at ¶ 5.  The County's General Protocols state that "in cases of obvious prolonged death" CPR on infants and children should "not be started."  *See* Plaintiff's Exhibit 1-C at ¶ 5.

[7]  This incident arose when Plaintiff sought and received permission to go to his home in Loxahatchee to retrieve his cold weather jacket.  Defendants claim that Plaintiff did not return immediately to work and that he "engaged in personal activities at his home for up to thirty minutes." (DE 50 at ¶ 17).  Plaintiff states that he packed up some food and cleaned up after his dog while he was home, but that he received permission to go there without restrictions.  (DE 80 at ¶ 11).  *See also* Declaration of Randolph Starling at ¶ 8.  Notably, another firefighter who was accused of being "out of zone" was only issued a written reprimand.  *See* Deposition of Chief Al Sierra at pages 16-17 (DE 62).

investigations and the grievance process; (3) Plaintiff was given an opportunity to respond to the evidence; and (4) Plaintiff was provided with a full and fair grievance hearing by an impartial decision maker, Administrator Herman Brice.  (DE 68 at pg 13).

Although Plaintiff does not deny receiving notices of the three investigations, Plaintiff disputes that he had access to the evidence against him before the discipline was imposed.  (DE 80 at ¶ 18 and pages 17, 24; *see also* Starling Declaration at ¶ 9).  Additionally, Plaintiff claims that the meeting with Brice did not provide him with a meaningful opportunity to clear his name because the procedure was such that he was only permitted to answer Brice's questions.  (DE 80 at pages 17, 24).[8]  Further, Plaintiff contends that under the union's Collective Bargaining Agreement (CBA), employees can pursue arbitration on their own, without the union's representation.  Plaintiff claims that the County unlawfully denied him the ability to do so.  (DE 80 at page 19-21).  The County contends that only the union has the right to pursue arbitration under the CBA and since the union declined to arbitrate Plaintiff's grievance, the County was under no obligation to engage in arbitration directly with Plaintiff.

On March 2, 2006, Administrator Brice held a Step Three Grievance Hearing regarding Plaintiff's demotion.  (DE 50 at ¶ 25).  Brice did not know if Plaintiff was provided with copies of the statements against him prior to the hearing, nevertheless, Defendants claim that Brice gave Plaintiff and his union representative, Mr. Brier, a "full and fair opportunity to present evidence and argument regarding the demotion and to clear Plaintiff's name."  *Id. See also* Brice

---

[8]  Plaintiff testified that his union representative told him to "only answer the questions that you're directly asked" and that he was not to give Brice any additional information regarding Fisher's motivation for harassing Plaintiff.  *See* Plaintiff's Dep. Tr. at pages 59-60, 62 (DE 65).  Plaintiff adhered to the advice because he was afraid of losing his job.  *Id.* at page 61.

Deposition at pages 18, 24-25, 44.  Ultimately, Brice denied Plaintiff's grievance and, based upon the recommendation of his senior staff (of which Fisher is not a member), Brice affirmed Plaintiff's demotion, finding that his three violations showed poor judgment, decision making and leadership.  *Id.*[9]

Administrator Brice testified that although a double demotion is a "severe" disciplinary action, he did not familiarize himself with the details of Plaintiff's alleged violations, he was unaware that his staff had not interviewed the elderly woman whom Plaintiff allegedly hit on the bicycle,[10] and he did not review any written reports of the investigations before making his determination.  Rather Brice, who claims he was unaware of the problems between Plaintiff and Fisher, relied on the oral briefings and recommendations of his senior staff in deciding to impose Plaintiff's double demotion.  *See* Brice Deposition at pages 13-15, 20, 24, 26, 33, 40, 54.  On April 18, 2006, Plaintiff's union informed him that it would not pursue arbitration of his demotion because it had "little chance of success on the merits."  *See* Defendants' Exhibit 25.

In their Motions for Summary Judgment, Defendants contend that Plaintiff's claims must

---

[9]  Brice's testimony regarding the reasons for Plaintiff's demotion is directly refuted by Plaintiff's mother, Helen Shattle.  In her declaration, Ms. Shattle states that she spoke to Brice shortly after her son's demotion.  According to Ms. Shattle, Brice told her that her son was demoted in part because of his relationship with Ms. Smith.  Brice said that he had received multiple complaints from Fisher about Plaintiff's relationship with Ms. Smith and that Fisher was "very insistent" that Plaintiff be demoted.  According to Ms. Shattle, Brice was against the demotion, but told her that "as a matter of practice, he typically followed his staff on disciplinary matters."  *See* Declaration of Helen Shattle at ¶ 3-5 (DE 80).  Brice admits to meeting with Ms. Shattle, but denies making these statements to her.  *See* Declaration of Herman W. Brice  at ¶ 2 (DE 93).

[10]  Plaintiff's mother located the elderly woman involved in the bicycle incident, Beatrice Smith, in the months following her son's demotion.  Plaintiff asked to present Beatrice Smith's statement to Administrator Brice, but was told by another district chief that he should "drop it" because he was lucky to still have a job.  *See* Plaintiff's Deposition at pages 69-70, 149-50, 183 (DE 102).

fail because: (1) the claims against the County negate the claims against Defendant Fisher in his official capacity; (2) Defendant Fisher is not a decisionmaker and thus cannot be held liable in his individual capacity; (3) the CBA's grievance and arbitration procedures provided Plaintiff with adequate procedural due process; and (4) Plaintiff does not have a First Amendment right of association to commit adultery.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Rule 56 (c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The issue for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party has the burden to establish the absence of a genuine issue as to any material fact.  *Id.*  Once the moving party has established the absence of a genuine issue of material fact, it is up to the non-moving party to proffer "specific facts showing that there is a genuine issue for trial" and that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Celotex v. Catrett*, 477 U.S. 317, 324 (1986).  The court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). *See*

8

*also Anderson*, 477 U.S. at 255 (the district court must remember that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").  A mere "scintilla of evidence" in support of the non-moving party's position is insufficient, however, to defeat a motion for summary judgment. *Id.* at 252.


### B.  Section 1983 Claims

A claim under Section 1983 requires proof that (1) the defendants deprived the plaintiff of a right secured by the Constitution or laws of the United States and (2) the deprivation was committed under color of state law.  *Artubel v. Colonial Bank Group, Inc.*, 2008 WL 3411785, *3 (M.D. Fla. Aug. 8, 2008)(*citing Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  "Because Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred, the first step in any such claim is to identify the specific constitutional right allegedly infringed."  *Artubel*, 2008 WL 3411785 at *3 (*quoting Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Here, Plaintiff alleges violations of his rights under the First and Fourteenth Amendments.


### C.  Official Capacity Claims

At the outset, the Court finds that to the extent the Complaint alleges claims against Defendant Fisher in his official capacity, such should be dismissed because "the plaintiff's ability to sue the [County] directly obviates the need for official capacity actions against the individual Defendants."  *Pete's Towing Co. v. City of Tampa, Fla.*, 2008 WL 4791821, *11 (M.D. Fla. Oct.

29, 2008).  Indeed, suits against an individual in his official capacity under Section 1983 "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  *See also Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)(in a suit against both a municipal entity and the entity's officer in his official capacity, "avoidance of redundancy compels dismissal of the named individual defendant in his official capacity").  Accordingly, to the extent the complaint asserts claims against the County and also Defendant Fisher in his official capacity, the latter are "redundant and properly dismissed with prejudice." *Pete's Towing Co.*, 2008 WL 4791821 at *11.

### D.  Individual Liability under § 1983

In his complaint, Plaintiff also seeks to impose individual liability upon Defendant Fisher under § 1983 for allegedly violating his First and Fourteenth Amendment rights.  The law is well settled that in order to hold a governmental official individually liable for a § 1983 claim, "he must be the official 'decisionmaker' for the aggrieved action." *Redding v. Tuggle*, 2007 WL 2462641, *28 (N.D. Ga. July 11, 2007)(*citing Kamensky v. Hillsborough County*, 148 Fed. Appx. 878, 879 (11th Cir. 2005) and *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003)).  *See also Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984)(individual liability for damages under § 1983 is predicated upon personal responsibility, involvement or participation).  A "decisionmaker" is someone "who has the power to make official decisions." *Redding*, 2007

10

WL 2462641at *28 (*quoting Kamensky*, 148 Fed. Appx. at 879).  Where the evidence in the record demonstrates that the individual defendant only had authority to recommend a certain employment decision, such individual is not a decisionmaker for purposes of § 1983.  *Redding*, 2007 WL 2462641at *28 ("the power to recommend [] does not impose individual liability under § 1983").

Here, although the record suggests that Defendant Fisher likely triggered the investigation of Plaintiff, it is also clear that Defendant Fisher did not have the authority to demote Plaintiff, nor was Fisher responsible for overseeing the process afforded Plaintiff at his grievance hearing. Indeed, in his responsive memorandum of law, Plaintiff fails to make any allegations connecting the alleged due process violation to Defendant Fisher.  Since Fisher is not a decisionmaker under § 1983, he cannot be held individually liable for the alleged constitutional violations Plaintiff suffered.  *See Redding*, 2007 WL 2462641at *28; *Kamensky*, 148 Fed. Appx. at 879.  *See also Schultz*, 738 F.2d 231 at 239 (plaintiff claimed he was terminated without proper notice, however, court found that the individually named defendants were not responsible for ensuring due process; only the individual who could have caused the constitutional deprivation could be held individually liable).

In light of the foregoing, the Court **RECOMMENDS** that Defendant Fisher's motion for summary judgment be **GRANTED** and that the claims against him be **DISMISSED.**  Based on this recommendation, the Court will limit its consideration hereafter to Plaintiff's First and Fourteenth Amendment claims against the County only.

### E.  First Amendment Right to Freedom of Association

It is well settled that the First Amendment protects two different kinds of associational activities: intimate and expressive.  *See McCabe v. Sharrett*, 12 F.3d 1558, 1562-63 (11th Cir. 1994).  With regard to intimate association, the First Amendment protects the freedom of individuals to associate "for the purely private purpose of forming and preserving personal and social relationships."  *Green v. City of Montgomery*, 792 F.Supp. 1238, 1252 (M.D. Ala. 1992)(the right to intimate association is "a fundamental aspect of personal liberty" which provides individuals with "the freedom to choose to enter into and maintain certain intimate human relationships").  At a minimum, the right of intimate association "encompasses the personal relationships that attend the creation and sustenance of a family-marriage . . ." *McCabe*, 12 F.3d at 1563 (*citing Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984).  "Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as 'relative smallness' and 'seclusion from others in critical aspects of the relationship.'" *McCabe,* 12 F.3d at 1563 (*citing Roberts*, 468 U.S. at 620).  In this regard, the Eleventh Circuit has held that "even a public employee's association choices as to whom to date enjoy constitutional protection." *Hatcher v. Board of Public Education and Orphanage*, 809 F.2d 1546 (11th Cir. 1987)(*citing Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984)(*abrogation on other grounds recognized by Scala v. City of Winter Park*, 116 F.3d 1396, 1402 (11th Cir. 1997)).  *See also Glenn v. Bachand*, 2007 WL 865488, *3 (E.D. Ark. March 20, 2007)("[t]here is a continuum of human relationships that are potentially protected, but the Supreme Court left it up to courts to engage in a careful assessment of the objective qualities of a personal attachment, and then to locate it on a spectrum from the most

intimate to the most attenuated . . . [t]he 'amorphous social relationship' of dating falls

somewhere on the continuum, and is, therefore, entitled to some constitutional protection").

      In establishing a First Amendment violation in the public employment context, a plaintiff

must first demonstrate that his activity is protected by the amendment.  This is a question of law.

*Hatcher,* 809 F.2d at 1556; *McCabe v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994).  Then the

plaintiff bears the burden of demonstrating that the protected conduct was "a substantial or

motivating factor" in the employer's decision to take an adverse employment action against the

plaintiff.  *Hatcher,* 809 F.2d at 1556.  *See also Anderson-Free v. Steptoe,* 970 F. Supp. 945, 957

(M.D. Ala. 1997)(plaintiff must demonstrate that her intimate associational activity was a

substantial or motivating factor in the decision not to renew her employment contract).   If this is

established, then the burden shifts to the defendant to show by a preponderance of the evidence

that "the same employment decision would have been rendered even in the absence of the

protected conduct."  *Hatcher,* 809 F.2d at 1556.  These burden shifting issues are questions of

fact.  *Id.*  Thus, to survive a motion for summary judgment, the plaintiff must make a showing

sufficient to permit a reasonable jury to find that his protected activity was a substantial or

motivating factor behind the adverse employment action.  *Gattis v. Brice,* 136 F.3d 724, 726 (11th

Cir. 1998).

      Because the right to freedom of association under the First Amendment "extends to

public employees being able to engage in associative activity without retaliation" *(Hatcher,* 809

F.2d at 1558), it follows that "official retaliation for the exercise of any constitutional right

creates an actionable claim under Section 1983." *Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir.

1997).  *See also White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990)("Retaliation for the

exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983.").

In the Eleventh Circuit, a public employee is shielded from retaliation by his employer whether or not the associational activities he has engaged in relate to a matter of public concern. *See D'Angelo v. School Bd. of Polk County, Fla.*, 497 F.3d 1203, 1212 (11th Cir. 2007)(the Eleventh Circuit has "long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment"). *See also Hatcher,* 809 F.2d at 1558; *Anderson-Free v. Steptoe,* 970 F. Supp. 945, 957 (M.D. Ala. 1997).

Here, Plaintiff must initially establish that his associational activities with Carolyn Smith were protected by the First Amendment. Given the Eleventh Circuit's expansive view of intimate associations that are protected by the First Amendment, the Court finds that Plaintiff has established that his relationship with Carolyn Smith was protected by the First Amendment. Indeed, based on the facts in the record regarding their relationship during the relevant time period and their subsequent marriage only four months later, it is clear that the purpose and intent of their relationship was the "creation . . . of a family-marriage." *McCabe*, 12 F.3d at 1563 (*citing Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984). The record also reflects the "relative smallness" of their association, which was to the "seclusion [of] others" in critical respects. Thus, because Plaintiff and Ms. Smith's monogamous co-habitation, which also involved a sharing of household chores and living expenses (*see* Carolyn Smith Dep. Tr. at page 13), exhibited "the qualities distinctive to family relationships," it follows that First Amendment protections should be extended to their intimate association. *See McCabe,* 12 F.3d at 1563

14

(*citing Roberts*, 468 U.S. at 620).  *See also Glenn v. Bachand*, 2007 WL 865488, *3-4 (E.D. Ark. March 20, 2007)(distinguishing the varying First Amendment protection afforded to a "casual affair" versus a more serious relationship and how the court must consider the "objective qualities" in determining where the association falls on the "continuum of human relationship"); *Angelilli v. Borough of Conshohocken*, 1996 WL 663871, *3 (E.D. Pa. Nov. 15, 1996)(before determining whether plaintiff's adulterous affair was protected by the First Amendment, court wanted the record developed as to the "length, nature, extent and degree of commitment of the relationship").[11]

This Court is also convinced that Plaintiff's double demotion constitutes an adverse employment action.  "To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004).  The Eleventh Circuit has found important conditions of employment to include discharges, demotions, and refusals to hire or promote.  *See also Goffer v. Marbury*, 956 F.2d 1045, 1049 n. 1 (11th Cir. 1992).

However, there too many factual disputes in the record before the Court regarding the

---

[11] Defendants contend that Plaintiff's First Amendment claim must fail because other courts have found that adultery is not a protected activity under the First Amendment.  *See Marcum v. McWhorter*, 308 F.3d 635, 642-43 (6th Cir. 2002);  *Caruso v. City of Cocoa, Florida*, 260 F.Supp.2d 1191, 1208 (M.D. Fla. 2003).  However, those decisions are not binding on this Court.  Moreover, the Court is not persuaded by Defendants' claim that because adultery is a crime in Florida, the Court is precluded from finding that Plaintiff and Ms. Smith's relationship is entitled to constitutional protection.  Rather, the Court is persuaded by the reasoning set forth in *Shumpert v. City of Fulton*, 1995 WL 1945434 (N.D. Miss. March 24, 1995), which states that although many cases "seem to turn on the issue of whether or not adultery is illegal in that particular state, [s]uch reliance on the legality of the activity is misplaced.  The issue is one of protection under the First Amendment to the Constitution of the United States and should apply equally in every state, regardless of whether that particular state has criminalized the activity in question."  *Id.* at n. 2.

15

motivation behind Plaintiff's double demotion to grant summary judgment on the First

Amendment claim.  Specifically, there is contradictory evidence before the Court as to how and

why the bicycle incident resurfaced over a year after it occurred.  The January 16, 2006 internal

memorandum from Captain Miller initiating the investigation simply states that he "was

apprised" of the incident, but does not reveal the source of the information.  *See* Defendants'

Exhibit 11.  Although Fisher denies that he was the source of the complaint, Plaintiff and

Carolyn Smith testified that Fisher was intent on having Plaintiff demoted, that Fisher was aware

of the bicycle incident when it occurred, and that the co-worker with whom Fisher was having an

affair confirmed that Fisher had initiated the complaint.[12]  Thus, it would be reasonable for a jury

to find that Fisher instigated the investigation of Plaintiff by making false allegations regarding

the bicycle incident.  Similarly, the factual disputes regarding the three incidents that allegedly

caused Plaintiff's demotion are numerous and if Plaintiff's version of those incidents is believed,

then the County's reasons for demoting Plaintiff become dubious, and a reasonable jury could

find that retaliation was the true motivation.[13]

　　　　Finally, the fact-finder should determine the extent to which any retaliatory motive

harbored by Fisher may have influenced Brice's senior staff, on whose recommendation Brice,

---

[12] Although Defendants characterize this testimony as "inadmissible hearsay" (DE 99 at page 3), the Eleventh Circuit has held that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'"  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  Given that the statement would likely be admissible at trial as evidence of Fisher's motive, intent or plan, the Court is entitled to rely upon it at this stage.

[13] For example, the Department's General Protocols appear to support Plaintiff's position that he acted properly when he refrained from giving CPR to an infant.  Similarly, the Court finds it significant that a firefighter without Plaintiff's level of seniority was only reprimanded for being "out of zone" whereas Plaintiff was treated much more harshly.

the decisionmaker, completely relied.  This is especially true in light of the evidence proffered by Plaintiff that (1) Brice knew Fisher wanted Plaintiff demoted because of his relationship with Ms. Smith; (2) Brice did not conduct an independent investigation; and (3) "as a matter of practice, [Brice] typically followed his staff on disciplinary matters."  *See* Declaration of Helen Shattle at ¶ 3-5 (DE 80).  *See Kamensky*, 148 Fed. Appx. at 880 ("a final policymaker may serve as the conduit of a subordinate's improper motive if he merely 'rubber stamps' the subordinate's recommendation")(*citing Quinn v. Monroe County*, 330 F.3d 1320, 1327 (11th Cir. 2003)).  *See also Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002)("[l]ocal government liability can exist when someone with final policymaking authority delegates that authority to someone else");  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999)("a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge . . . causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus.").

Given that the evidence presented could suggest an unlawful custom or policy, the County is not entitled to summary judgment on Plaintiff's First Amendment claim.  *See Gattis v. Brice,* 136 F.3d at 727 (evidence that Brice "not only accepted the recommendation of his deputy chiefs, but knew of and ratified the improper motives behind their recommendation" would be sufficient to demonstrate an unconstitutional County policy).  *See also Longo v. Suffolk County Police Dept. County of Suffolk,* 429 F.Supp.2d 553, 558 (E.D.N.Y. 2006)(a government official's

17

"[c]ontinuing adherence to an approach that consistently results in unconstitutional acts . . . may establish such deliberate indifference as to trigger municipal liability").

In light of these factual disputes, it would be inappropriate for this Court to decide these issues on summary judgment.  Rather, because a reasonable jury could resolve the disputed facts in favor of Plaintiff, the trier of fact should decide these issues.  *See Hatcher,* 809 F.2d at 1558 (where Court determined that plaintiff's associational activities were within the confines of the First Amendment and that she had suffered an adverse employment action, Court held that the remaining disputed issues of fact precluded summary judgment and that the fact-finder should determine the employer's motivation); *Ferrara v. Mills,* 781 F.2d 1508, 1515 (11th Cir. 1986)("summary judgment is particularly inappropriate in First Amendment cases");  *Johnson v. Scotty's, Inc.*, 119 F. Supp. 2d 1276, 1287 (M.D. Fla. 2000)(where plaintiff raised genuine issues of material fact regarding defendants' true motivation for terminating her, court denied summary judgment).

### F.  Procedural Due Process

Plaintiff's second constitutional claim pursuant to §1983 is that the County violated his Fourteenth Amendment right to procedural due process.

The Due Process Clause of the Fourteenth Amendment provides in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Procedural due process guarantees that a State "may not effect a deprivation of life, liberty, or property without certain procedural safeguards."  *Pettco Enterprises, Inc. v. White*, 896 F.Supp. 1137, 1146 (M.D. Ala. 1995).  It requires that "the state

provide fair procedures and an impartial decision maker before infringing on a person's interest

in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).  Its purpose

is to protect people "from the mistaken or unjustified deprivation of life, liberty, or property."

*Carey v. Piphus*, 435 U.S. 247, 259 (1978).

In order to state a § 1983 procedural due process claim a plaintiff must allege three

elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state

action; and (3) constitutionally-inadequate process." *Roy v. Board of County Commissioners,

Walton County, Fla.*, 2007 WL 3345352, *5 (N.D. Fla. Nov. 9, 2007)(*quoting Grayden v.

Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).  A procedural due process violation does not

exist, however, "unless and until the State fails to provide due process." *McKinney v. Pate*, 20

F.3d 1550, 1557 (11th Cir. 1994).  This is because it is not the deprivation of a protected interest

that causes a violation, but rather, "[i]t is the state's failure to provide adequate procedures to

remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a

federal procedural due process claim." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir.2000).

Procedural due process claims may arise from an employee's demotion or termination

because state employees are entitled to procedural due process before they can be deprived of

their property right in their employment.  *Howell v. Douglas County School Dist.*, 2008 WL

1815587, *7 (N.D. Ga. April 21, 2008).  The Supreme Court has established that procedural due

process requires that an employee receive (1) notice of the employment decision to be considered

and (2) an opportunity for "some kind of a hearing" before the deprivation is imposed.  *Howell,

2008 WL 1815587, *7.  See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546

(1985)(due process mandates that "a tenured public employee is entitled to oral or written notice

of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story").

In considering Plaintiff's claims that he was denied due process at his hearing because (1) he was not given an opportunity to review the evidence against him and (2) he was not permitted to give his version of events, these claims must fail.  It is well settled that regardless of whether a plaintiff's due process rights were violated during a Step Three Grievance Hearing, the availability of arbitration at Step Four is a sufficient procedural safeguard against any potential bias.

The district court in *Jackson v. Temple University* encountered a nearly-identical factual scenario and denied the plaintiff's due process claim.  In affirming the district court's decision, the Third Circuit noted that

> [t]he Union, as the sole and exclusive bargaining representative, had the ultimate power to make a fair and responsible determination as to whether it would invoke the arbitration provision available under the collective bargaining agreement.  The right to proceed to arbitration provided [plaintiff] with an adequate due process safeguard even if the hearing conducted by the [e]mployer earlier had been inherently biased.

*Jackson*, 721 F.2d 931, 933 (3d Cir. 1983).

Similarly here, the fact that Plaintiff had the remedy of arbitration available to him, regardless of whether the union elected to pursue it, amounts to sufficient protection against a deprivation of Plaintiff's due process rights.  *See also Rhoads v. Board of Educ. of Mad River Local School Dist.*, 103 Fed. Appx. 888, 896-87 (6th Cir. 2004); *Armstrong v. Meyers*, 964 F.2d 948, 951 (9th Cir. 1992).

Finally, to the extent Plaintiff claims that the County wrongfully denied him the ability to

20

arbitrate on his own, this Court finds such argument to be unpersuasive.  Article 16, § 1 of the

CBA clearly sets forth a four-step procedure governing grievances between the County and its

employees.  During the first three steps (verbal discussion, written grievance and hearing), the

employee may choose to be represented by a union representative.  If the employee so chooses,

and is dissatisfied with the outcome of the Step Three Hearing, the CBA provides that only the

union has the "exclusive right" to proceed to arbitration.  Plaintiff's reliance on the language in

Article 16, § 7, that the employee can elect not to have union representation, is misplaced.  The

Court construes such language to indicate that the employee must make a decision as to his

representation before engaging in the first three steps and that if the employee opts for union

representation, then he is bound by the union's decision of whether to arbitrate.  Accordingly, the

County was not obligated to arbitrate directly with Plaintiff.


III.   **CONCLUSION**

Accordingly, with regard to Defendants' Motions for Summary Judgment, this Court

**RECOMMENDS**:

(1) that Defendant Fisher's Motion (DE 68) be **GRANTED** and that Plaintiff's claims

against Defendant Fisher be dismissed**;**

(2) that Defendant County's Motion (DE 50) be **GRANTED** as to Plaintiff's due process

claim under the Fourteenth Amendment, but **DENIED** as to Plaintiff's First Amendment claim.[14]

---

[14]  To the extent the parties' motions to strike (DE 92, 99, 108, 135, 143) are not rendered moot by this Report and Recommendation, they are **denied.**  Likewise, Defendants' motion to extend the time to respond to Plaintiff's motion to strike (DE 144) is also **denied as moot.**

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Daniel T. K. Hurley, United States District Judge for the Southern District of Florida, within ten (10) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982). Failure to timely file written objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in Chambers this <u>31</u> day of December, 2008 at West Palm Beach in the Southern District of Florida.

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

cc:    Counsel of Record

22